**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

JOEL PRICE,

     Plaintiff,

v.                                Case No. 8:25-cv-3398-KKM-AEP

THE INDIVIDUALS,
PARTNERSHIPS, and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE A.,

     Defendants.

_____

**ORDER**

Trademark holder Joel Price sues 102 anonymous American and foreign online sellers for Lanham Act and common law violations. Am. Compl. (Doc. 41). After receiving a temporary restraining order, Price seeks a preliminary injunction to enjoin infringement and require nonparty marketplaces and financial institutions to freeze assets and provide discovery about the sellers. Temporary Restraining Order (TRO) (Doc. 12); Mot. PI (Doc. 19). Price's motion presents difficult merits and procedural questions regarding due process and joinder. It also presses the bounds of the judiciary's equitable powers. For the below reasons, I deny the motion for a preliminary injunction,

vacate the temporary restraining order, and dismiss all remaining defendants but Liesl Cone from the action.

## I.   BACKGROUND

### A. "Schedule A" Litigation

This "Schedule A" case—named for the sealed list that plaintiffs use to (somewhat) identify defendants—follows the mold of thousands like it that have appeared in the last few decades.[1] *See* Eric Goldman, *A Sad Scheme of Abusive Intellectual Property Litigation*, 123 COLUM. L. REV. F. 183, 195 (2023) ("SAD Scheme"). Schedule A litigation features a single action filed against dozens, if not hundreds, of online sellers of allegedly infringing products. *See id.* at 184; *Eicher Motors Ltd. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 794 F. Supp. 3d 543, 546–47 (N.D. Ill. Aug. 8, 2025). Most Schedule A cases are "brought on an ex parte basis and are accompanied by (1) a motion seeking an emergency temporary restraining order against the allegedly infringing behavior; (2) a request for a prejudgment asset restraint; (3) a motion to keep a portion, or even all, of the proceedings sealed; and (4) a motion for electronic service of process." *Eicher Motors*, 794 F. Supp. 3d at 546–47. A Schedule A plaintiff ordinarily justifies the need for a sealed list of infringers and an ex parte temporary restraining order that freezes those

---

[1] One scholar estimated that, as of December 2022, over 88% of "Schedule A" cases were filed in the Northern District of Illinois, with the Southern District of Florida second in line. SAD Scheme at 194–95.

unnamed entities' assets held by nonparties on the basis that many of the infringers are foreign entities that will quickly hide assets and otherwise evade judicial proceedings, thereby depriving the plaintiff of a meaningful remedy. *See, e.g., id.* at 548; *Zorro Prods., Inc. v. Individuals, Corps., Ltd. Liab. Cos., P'ships, & Unincorporated Ass'ns Identified on Schedule A Hereto*, No. 23-CV-5761, 2023 WL 8807254, at \*4–5 (N.D. Ill. Dec. 20, 2023) (denying a motion to seal); *see also* SAD Scheme at 199–200.

The complaints ordinarily "are drafted at a high level of generality (bordering on boilerplate) and lack specifics as to each defendant or how the defendants relate to one another." *Eicher Motors*, 794 F. Supp. 3d at 546; *see also Zorro Prods.*, 2023 WL 8807254, at \*2 ("By and large, the Schedule A bar uses the same template in each case, treating the filings like a factory mold. They change a few names, tinker here and there, and then kick out a new complaint for a new client."). Some—including this action—provide only screenshots and an affidavit from the plaintiff as evidence of infringement. *Eicher Motors*, 794 F. Supp. 3d at 554.

No clear consensus has emerged on how to resolve Schedule A litigation problems. Some district judges have concluded that "the Schedule A mechanism should no longer be perpetuated in its present form." *Id.* at 556; *see also Zorro Prods*, 2023 WL 8807254, at \*4–5 (concluding that sealing is inappropriate in Schedule A cases); *cf. CIN Corp v. Individuals, P'ships, and*

*Unincorporated Ass'ns Identified on Schedule "A"*, No. 24-24969-CIV, 2025 WL 1433742, at *1–3 (S.D. Fla. Jan. 7, 2025) (explaining why an action that combines more than 100 alleged infringers in one action violates Federal Rule of Civil Procedure 20). The Seventh Circuit, home to most Schedule A cases, recognizes that district courts are "understandably[] troubled" about the Schedule A trend. *Dolls Kill, Inc. v. MengEryt*, No. 24-2841, 2025 WL 3033729, at *2 (7th Cir. Oct. 30, 2025). Yet "no Seventh Circuit decision has comprehensively addressed whether the Schedule A mechanism comports with the Federal Rules of Civil Procedure or general principles of procedural due process." *Eicher Motors*, 794 F. Supp. 3d at 547 n.4; *cf. Dolls Kill*, 2025 WL 3033729, at *2 (emphasizing that "[d]istrict courts have broad discretion in managing these cases, which often depart from the general rule in favor of adversarial proceedings) (citation modified); *cf. NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 617, 624–27 (7th Cir. 2022) (concluding that a district court had personal jurisdiction over a foreign online seller). Other circuits have rejected expansive interpretations of specific procedural rules. *See ABC Corp. I v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 52 F.4th 934, 943–44 (Fed. Cir. 2022) (explaining that Federal Rule of Civil Procedure 65 does not permit generalized findings of copyright infringement); *Smart Study Co., Ltd v. Shenzhenshixindajixieyouxiangongsi*, 164 F.4th 164, 170–72 (2d Cir. 2025) (concluding that email service on a foreign defendant was not proper under

Federal Rules of Civil Procedure 4(f)(2) and (3)). For my purposes, although at least one Schedule A case reached the Eleventh Circuit, the panel declined to review any thorny issues due to mootness. *Ain Jeem, Inc. v. Individuals, P'ships, & Unincorporated Ass'ns Identified on Schedule A*, No. 23-13380, 2025 WL 3484945, at *6–7 (11th Cir. Dec. 4, 2025) (per curiam).

Despite the prevalence of these actions, Schedule A litigation often evades review. Many Schedule A plaintiffs secure temporary restraining orders, including seizures of the defendants' assets, which are ordinarily not appealable. It appears many defendants then settle after their funds are frozen. *See Eicher Motors*, 794 F. Supp. 3d at 553 (describing "an asset freeze that strangles defendants at the outset, thus rationally prompting them to settle involuntarily"). If any defendant persists past that point and raises a jurisdictional or other issue, a plaintiff may voluntarily dismiss claims against that defendant, thereby mooting any appeal. *See* SAD Scheme at *191–92. Indeed, that appears to have occurred in *Ain Jeem. See* 2025 WL 3484945, at *2–3 (describing that the plaintiff withdrew its motion for a preliminary injunction as applied to the individual seller who raised objections, and then voluntarily dismissed its claims against that seller); *cf. Smart Study Co.,* 164 F.4th at 169 (describing a plaintiff dismissing two defendants from an action after they objected to personal jurisdiction). As Schedule A actions often

involve more than 100 defendants, dismissing one might present a more efficient route than litigating the procedural and jurisdictional problems.

### B. Factual Background

Price's action comports with the above-described prototype, with the one deviation being that many sellers are located in the United States. Am. Compl. ¶¶ 11. Price owns the federally registered trademark, "White Privilege Card," as used in connection with novelty plastic identification cards sold for entertainment purposes. Am. Compl. ¶ 8; Trademark (Doc. 41-2) at 2. He brings five counts: Trademark Infringement and Counterfeiting under 15 U.S.C. § 1114(1) (Counts I and II); False Designation of Origin or False Description under 15 U.S.C. § 1125(a) (Count III), and common law unfair competition and trademark infringement (Counts IV and V). Am. Compl. At the time that Price moved for a temporary restraining order, Price provided no legal names of the sellers, who he alleges have illegally promoted, offered for sale, or sold goods bearing and using the Mark. Mot. TRO (Doc. 11) at 2–4, 7–9; Sch. A (Doc. 2-1). He averred that the sellers operate on third-party platforms including eBay, Etsy, Amazon, TikTok, as well as six other "personalized storefront" websites. Sch. A at 2–6. Price urged that, "[a]bsent a temporary restraining order without notice, Defendants can and will significantly alter the status quo" by changing their account information and moving funds into offshore bank accounts. Mot. TRO at 10–11; *see also* Mot. PI

at 14. Price insisted that "Defendants maintain off-shore bank accounts and regularly move funds . . . outside the jurisdiction of this Court." Mot. TRO at 9; *see also* Mot. PI at 14.

The Court partially granted Price's motion for a temporary restraining order, and the order expired on January 26, 2026. TRO (Doc. 12); Orders Extending TRO (Docs. 18, 20). Price now moves for a preliminary injunction, seeking essentially the same scope of injunctive relief as the temporary restraining order. Mot. PI (Doc. 19).

Price moves for a preliminary injunction based on the list of sellers (Schedule A); a compilation of screenshots of the allegedly infringing products (Schedule B); an affidavit; his trademark registration; copies of communications between Price, nonparties, and defendants dated after the temporary restraining order; notices of compliance with Court orders; and his other motions. Sch. A (Doc. 2-1); Sch. B (Doc. 2-2); Price Aff. (Doc. 3-1); Trademark; *see* Not. (Doc. 27) at 2–4 (listing papers Price relies upon). Schedule A, filed under seal, is a spreadsheet that identifies sellers by what Price calls their "business names" and provides links to webpages that allegedly sell infringing goods.[2] Sch. A; Compl. ¶ 10–11. Schedule B features

---

[2] A "business name" is either a "Seller ID" or "Subject Domain Name." A "Seller ID" refers to a seller who operates on "internet-based e-commerce stores and Internet marketplace websites." Compl. ¶ 11; Am. Compl. ¶ 19. A "Subject Domain Name[]"

7

150 pages of screenshots. Sch. B. Schedule B does not clearly match the listing to the seller, but upon close review of the first several pages, the website links in the search bar appear to match the links on Schedule A. Absent from the preliminary injunction motion and the properly attached papers upon which it relies is any description or a visual depiction of Price's own products or how the Mark appears in context. *See* Local Rule 6.02(a)(2) (requiring "an attachment [of] each paper on which the movant relies"); *cf.* Resp. to OSC (Doc. 39) (including descriptions of the two kinds of cards that Price sells); Am. Compl. ¶ 38 (same), Ex. A (Doc. 41-2) at 9 (including an image of one card that Price sells). As to the evidence attached to the motion and referenced in the complaint, Price avers that he began developing, advertising, and promoting the Mark on social media in 2020. Price Aff. ¶ 5. But he says nothing about specific trade channels, advertising, or his customer base.

Price offers only generalized arguments about the sellers' products and the similarity of the goods. For example, Counts I and II assert that sellers' goods "are identical to, or substantially indistinguishable from, the Mark." Compl. ¶¶ 50, 61; Am. Compl. ¶¶ 59, 70. Count III alleges that "Defendants' infringing and counterfeited goods . . . are *virtually identical* in appearance to

refers to a seller who uses a freestanding website to sell goods instead of a third-party marketplace. *See* Compl. ¶¶ 11–12; Am. Compl. ¶ 20–21.

Plaintiff's respective genuine goods." Compl. ¶ 74; Am. Compl. ¶ 83 (emphasis added). But in what way, Price does not say.

As for the screenshots, Schedule B encompasses a wide variety of products. The majority feature one of two designs. The first is a white card with black font that says "WHITE PRIVILEGE CARD" "TRUMPS EVERYTHING" at the top. And the second is a black card with white font that says "WHITE PRIVILEGE CARD" above a picture of George Washington:

 

Sch. B at 104, 60.

There is variation among the rest of the images. Several say "White Privilege Card" or "White Privilege" and feature designs with varying degrees of distinction. *See, e.g. id.* at 123, 131. At least four bear little resemblance to the Mark or any other card in Schedule B. For example, one card says "CHECK YOUR" followed by "PRIVILEGE" in large font. Sch. B at 44. Underneath there

is a checklist with words including white, money, male, and pretty, all of which are the same, smaller size font.



*Id.* Another screenshot shows a fake social security card with the words "White Privilege" at the top and a picture of Napoleon Dynamite underneath.



*Id.* at 45. One of the listings appears to be a decal sticker rather than a card, and another has pink lettering and gold designs that look nothing like the other products.



*Id.* at 9, 49.

Price presents no additional evidence of market confusion, and he offers no argument in his motion for a preliminary injunction as to how a consumer would confuse these with his Mark. That said, in his motion for a temporary restraining order, Price broadly averred that both the sellers and he "sell and advertise via the Internet in the same geographical distribution areas within the United States, including Florida and within this District, through Internet-based e-commerce platforms." Mot. TRO at 8. Price does not point to evidence

11

or specify who sells what, where, or which "Internet-based e-commerce platforms" he utilizes. *See id.* As noted already, Price never submits a photo of his own Mark in context as part of a verified complaint, motion for preliminary injunction, or other properly attached paper. *See* Local Rules 6.01, 6.02.

### C. Procedural History

On December 12, 2025, Price filed the complaint, alleging five counts of trademark infringement. *See* Compl. Counts One through Three, brought under the Lanham Act, allege trademark infringement, trademark counterfeiting, and false designation of origin or false description. Am. Compl. ¶¶ 57–91. The remaining counts allege common law unfair competition and trademark infringement under Florida law. *Id.* ¶¶ 92–101. Price moved to seal Schedules A and B with the sellers' identities and screenshots of their products and moved for a temporary restraining order. Mot. TRO (Doc. 3). This Court granted in part and issued a temporary restraining order. *See* Docs. 7, TRO (Doc. 12), Orders Extending TRO (Docs. 18, 20). Consistent with the twenty-eight-day limit in Federal Rule of Civil Procedure 65, the temporary restraining order expired on January 26, 2026. (Doc. 20).

While in effect, the temporary restraining order banned the sellers from infringing Price's Mark and, notably, purported to bind nonparty marketplaces and financial institutions. Specifically, the order directed nonparties to provide

discovery related to the identities of the sellers and to freeze the sellers' assets, including all funds in, going in, and going out of, their accounts:

> [A]ny third party financial institution, . . . or marketplace platform who is providing services for the defendants," must "[r]estrain the transfer of all funds, including funds relating to ongoing account activity, held or received for any of the defendant's benefit or to be transferred into any of the defendant's respective financial accounts, restrain any other financial accounts tied thereto, and immediately divert those restrained funds to a holding account for the trust of the Court. Such restraining of the funds and the disclosure of the related financial institution account information (as provided below) shall be made without notice to the account owners or the financial institutions until after those accounts are restrained."

TRO at 8–9.

Price moved for a preliminary injunction or to extend the temporary restraining order. *See* Mot. PI. The proposed preliminary injunction largely tracks the relief provided in the temporary restraining order, with some additions that the Court previously rejected, including a ban on defendants from transferring or disposing of any money or assets in their financial accounts and a directive to nonparties to provide discovery on defendants' operations and sales. *See* Proposed PI (Doc. 19-5) at 7–10. Neither the temporary restraining order nor the proposed preliminary injunction provides the name of any defendant, although the recently amended complaint includes a list of the sellers by name and location. *See* Am. Compl. ¶ 11(a). Lastly, the proposed preliminary injunction mandates that assets be frozen *without notice*, in contradiction to Rule 65. Proposed PI at 9.

13

Recognizing that a temporary restraining order converts to a preliminary injunction after twenty-eight days, the Court declined to extend the temporary restraining order past that time, scheduled a hearing on the preliminary injunction motion for February 4, 2026, and ordered Price to provide notice to all defendants. *See* (Doc. 20) at 3. The Court also directed Price to provide all papers on which he relies for his motion prior to the hearing, in accordance with the Local Rule 6.02. *See id.*

For the first time at the hearing on February 4, Price displayed a picture of his product. Hr'g. After counsel conceded that the picture was not in the record, I instructed counsel to "file it as an exhibit that you submitted today" and to review Local Rule 6.02. Tr. 29:23–30:6. Upon confirmation that Price had not notified many of the defendants by the date required, I continued the hearing to February 20, 2026. *See* (Doc. 30).

Since February 4, I ordered Price to show cause why the defendants on Schedule A should not be severed and dismissed, and I directed Price to file an amended complaint identifying each defendant by legal name, to the extent he has such information. Order to Show Cause ("OSC") (Doc. 34); Order to File Am. Compl. (Doc. 40). Price responded to the show-cause order, (Doc. 39), and filed an amended complaint, (Doc. 41).

After the Court entered the temporary restraining order, most nonparty marketplaces and financial institutions implemented asset freezes, gave Price

14

identifying information about the defendants, or some combination of the two. *See* (Doc. 28) at 3–7; Hr'g. Price moved for contempt against the nonparty marketplaces that did not cooperate before the temporary restraining order expired. Mot. Contempt (Doc. 21). Regarding the marketplaces that froze assets, Price represented at the February 4 hearing that the freezes remain in place despite the expiration of the temporary restraining order. Hr'g.

As for the defendants, Price reported settlements with approximately twenty-three sellers and separately filed notices of voluntary dismissal of his claims against another nineteen. *See* (Docs. 28, 48, 51, 52, 53). Four sellers responded to the preliminary injunction motion, and Price settled or voluntarily dismissed his claims against all but one of them. *See* (Docs. 31, 32, 35, 36, 52, 53).[3]

The remaining seller is Liesl Geneva Cone, who objected to the motion and brings counterclaims against Price. Cone Aff. (Doc. 31) at 2. Cone produces the "Check Your Privilege" card described above. *See supra*, Section II.B. She notes that her product "is markedly different from all other products named in this suit" and is printed on cardstock rather than plastic or metal. Cone Aff. at 1. She also provides evidence that she sold her product in 2017, three years before Price began developing his. *Compare* (Doc. 31-1), *with* Price Aff. ¶ 5. In

---

[3] One seller sought an extension of time, (Doc. 36), and the other three responded to the motion on the merits.

her response to the motion for a preliminary injunction, Cone makes no argument about the differences between her product and Price's products; nor could she—there were no images of Price's products anywhere in the record when she filed her response. *See id.* After responding to the motion, Cone answered and now brings counterclaims for a declaratory judgment of non-infringement and cancellation of Price's Mark based on abandonment, invalid assignment, and common-law prior use. Answer & Countercls. (Doc. 50).

## II.  LEGAL STANDARDS

### A. Equitable Relief Under Rule 65

To obtain a temporary restraining order or a preliminary injunction, the movant must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225–26 (11th Cir. 2005) (per curiam); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

A court may issue a temporary restraining order without "prior notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in

16

opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).[4]

Preliminary injunctions differ from temporary restraining orders in at least one critical way: before the former "[may] issue, the nonmoving party must have notice and an opportunity to present its opposition to the injunction." *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). "Rule 65 does not define 'notice,' and the sufficiency of notice is a matter left within the discretion of the trial court," though "the Supreme Court has stated that the notice requirement 'implies a hearing in which the defendants given a fair opportunity to oppose the application and to prepare for such opposition.'" *Id.* (quoting *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. at 434 n. 7). To ensure that a defendant can prepare a response, Local Rule 6.02(a)(2) requires that a motion for a preliminary injunction "include as an attachment each paper on which the movant relies."

---

[4] Local Rule 6.01 mirrors Rule 65 and requires that any motion for a temporary restraining order include "specific facts—supported by a verified complaint, an affidavit, or other evidence—demonstrating an entitlement to relief," as well as "a precise description of the conduct and the persons subject to restraint." Local Rule 6.01(a)(2), (3).

17

Rule 65 restrains the reach of temporary restraining orders and preliminary injunctions alike. An injunction must be limited in scope as "a court of equity 'cannot lawfully enjoin the world at large, no matter how broadly it words its decree.' " *United States, v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023) (quoting *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930)). "[U]nlike a congressionally enacted statute, which can apply to everyone, an injunction generally applies to only those over whom the court has jurisdiction in the proceedings leading to the injunction, and only to the extent that the injunction gives notice to them." *Id* at 873. Thus, under either vehicle, application to "[p]ersons who are not actual parties to the action or [their privies]" is limited to "nonparties who have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction." *Id.* at 881 (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE, § 2956 (3d ed. 2023)).

## B. Joinder

Federal Rule of Civil Procedure 20 provides two requirements for joining defendants in a single action. First, "any right to relief" must be "asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences." FED. R. CIV. P. 20(a)(2)(A). Second, there must be a "question of law or fact common to all defendants [that] arise[s] in the action." *Id.*

18

20(a)(2)(B). Under Federal Rule of Civil Procedure 21, a "court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." FED. R. CIV. P. 21.

## III.   ANALYSIS

Because of procedural irregularities, due process problems, and the absence of evidence to support a substantial likelihood of success on the merits, I vacate the temporary restraining order, deny the motion for a preliminary injunction, and dismiss the amended complaint as to all defendants but Cone.

### A. Vacatur of the Temporary Restraining Order

I vacate the temporary restraining order because Price's motion failed to comply with Federal Rule of Civil Procedure 65 and this Court lacked authority to bind nonparties.[5]

Equity and Rule 65 set a high bar before a court may enjoin a party without notice and an opportunity to be heard. The movant must provide "specific facts in an affidavit or a verified complaint" that "clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." FED. R. CIV. P. 65(b)(1)(A).

---

[5] Price's evidence about the consumer market and channels remains unclear, but I note that this court lacks subject-matter jurisdiction to enjoin extraterritorial infringement (i.e., to enjoin a foreign seller from selling products abroad). *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 428 (2023) (holding that Sections 32(1)(a) and 43(a)(1)(A) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a)(1), are not extraterritorial).

As an additional safeguard, "the movant's attorney" must "certif[y] in writing . . . why [notice] should not be required." *Id.* 65(b)(1)(B). Price provided none of the above, and those failures alone require vacatur of the temporary restraining order.

Price did not allege under oath any "specific facts" showing that notice would cause him irreparable injury. First, his affidavit—which accompanied his initial, but not renewed, motion for a temporary restraining order—did not mention notice at all, and he did not submit a verified complaint.[6] *See* Price Aff.; Compl. Price did allege irreparable harm in his affidavit, but only in general terms without differentiation between the over 100 sellers' products or the sellers' likelihood of evading judicial action. He averred that the defendants' infringement harmed his "business reputation," and that, as a result, he was "experiencing irreparable damage." Price Aff. ¶ 13. Price did not offer a single example of consumer confusion or specify any product or defendant in particular. *See id.* "[This] approach is, on its face, incompatible with Rule 65(b)'s specificity requirement." *Eicher Motors*, 794 F. Supp. 3d at 550.

---

[6] Price's affidavit accompanied his first motion for a temporary restraining order, which this Court denied for "failure to provide the link to the proposed website for notice." *See* (Docs. 2, 8). Price attached no affidavit at all to his renewed motion for a temporary restraining order. *See* (Doc. 11).

In the renewed motion for a temporary restraining order, Price argued that notice would cause irreparable harm, but again offered only conclusory, generalized statements. *See* Mot. TRO at 11 (alleging that "upon information and belief, the e-commerce stores at issue are under Defendants' control, giving Defendants the ability to change ownership or modify e-commerce store data"). But just because the sellers might change ownership does not mean that they will. Price's " 'naked assertion[s]' devoid of 'further factual enhancement' " fail to satisfy Rule 8, let alone Rule 65. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Aside from the above procedural deficiencies, Price sought (and secured) a temporary restraining order against nonparties that mandated asset freezes and certain discovery. But the Court must have authority to enjoin a party. Rule 65 contemplates injunctions against a party, persons acting on behalf of a party (such as officers and employees), and limited categories of nonparties. FED. R. CIV. P. 65(d)(2). Specifically, a court's jurisdiction is limited to a nonparty who (1) acts in concert; (2) aids and abets; or (3) is in privy with the defendant. *Robinson*, 83 F.4th at 881. "[M]erely naming" a nonparty in an order does not give a court contempt authority. *See id.* (quoting 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2956)).

The nonparty marketplaces and financial institutions do not fall within the ambit of Rule 65. Reviewing the sworn facts, Price alleged that the

21

defendant sellers use third-party marketplaces to sell infringing goods. Price Aff. ¶¶ 7–11. Price never alleged that the nonparties were aiding and abetting the infringement or otherwise acting in concert with the sellers under Rule 65(d)(2)(C). *See generally* Price Aff. To be sure, Price provides no indication that any nonparty marketplace or financial institution knew or should have known about the alleged infringing listings before the Court entered the temporary restraining order. Thus, no marketplace or financial institution came within the scope of Rule 65 at the time the temporary restraining order was entered. *See* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:20.50 (5th ed.) (hereinafter "MCCARTHY").

But a nonparty's initial lack of knowledge does not necessarily absolve it of future obligations. To begin, once a plaintiff notifies an online marketplace of an injunction against sellers using the nonparty platform, continued disregard for those sellers' abuses might obligate the nonparty platform.[7] *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010) (holding that "contributory trademark infringement [would] lie" if "a service provider" has

---

[7] Albeit in dicta, the Eleventh Circuit has suggested that landlords who know their tenant-sellers are infringing are contributorily liable. *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1313 n.4 (11th Cir. 2019) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . permits the other to act upon his premises or with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously." (quoting Restatement (Second) of Torts § 877(c)). "The principles" of landlord liability for infringing stores "could be applied" to what amount to "internet auction house[s]." MCCARTHY § 25:20:50.

22

notice of specific infringing listings). The distinction, of course, is one of notice to the nonparty. The liability of nonparty marketplaces or service providers for infringement is a live issue. *See Sony Music Ent. v. Cox Commc'ns, Inc.*, 93 F.4th 222, 236 (4th Cir. 2024) (considering whether an internet-service provider is vicariously liable for copyright infringement), *cert. granted*, 145 S. Ct. 2841 (2025), and *cert. denied*, 145 S. Ct. 2844 (2025). But even assuming such liability for the purposes of Rule 65, once again notice to that nonparty is key.

As a result, at the time that the temporary restraining order was entered, Price failed to prove that the Court had authority to direct a nonparty financial institution or marketplace to halt the movement of funds in an account when that nonparty did not know about the infringement. The Second Circuit explained this limitation in the context of asset freezes and banks:

> [O]nce a district court issues a preliminary asset freeze order enjoining *parties* over whom it has jurisdiction, that injunction automatically forbids others—who are not directly enjoined but who act in active concert or participation with an enjoined party— from assisting in [its] violation. *But such injunctions do not directly restrain the conduct of nonparties.* Instead, they provide these nonparties with notice that they could become liable through Rule 65 if they assist in violating the district court's orders.

*Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 130 (2d Cir. 2014) (citation modified) (emphasis added).

23

Because Price's motion lacked specific, verified facts showing either infringement or irreparable harm that would result from notice to the sellers and because the temporary restraining order purported to bind nonparties, I vacate that order.

### B. Denial of Preliminary Injunction Motion

Price does not offer sufficient evidence to show a substantial likelihood of success on the merits and the equities do not favor a preliminary injunction. Specifically, Price fails to provide evidence of how the Mark appears in context, making it impossible to assess whether the defendants' marks are identical or similar to Price's Mark or otherwise evaluate consumer confusion. Even if Price had properly submitted evidence of his Mark, his arguments about the similarity of the sellers' products are too generalized, and Price presents no evidence of the strength of his Mark or the market more broadly. Indeed, several allegedly infringing products bear no resemblance to the description of Price's Mark. *See* FED. R. CIV. P. 8(a); *cf. ABC Corp.* 52 F.4th at 943 (holding that Rule 65 requires product-specific analyses of infringement).

In Counts One through Three, Price alleges federal violations trademark infringement, trademark counterfeiting, and false designation or description. These counts arise under the Lanham Act, which forbids "the unauthorized use 'in commerce' of a protected trademark when, among other things, that use 'is likely to cause confusion.' " *Abitron,* 600 U.S. at 422–23 (quoting 15 U.S.C

24

§§ 1114(a)(1), 1125(a)(1)). All three of the Lanham Act counts "are measured by identical standards" as to whether Price "is the prior owner of the trademark," the defendants "used the mark in commerce," and whether the marks are identical or "likely to cause confusion." *Kobe Japanese Steak House of Fla., Inc. v. XU, Inc.*, No. 8:14-CV-490-T-23MAP, 2014 WL 6608967, at *3 (M.D. Fla. Nov. 20, 2014) (adopting report and recommendation); *see Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935 n. 16 (11th Cir. 2010) ("The likelihood of confusion test applies to both causes under the Lanham Act—infringement and false designation of origin.").

Price's state law trademark infringement and unfair competition claims apply the same standards as the federal trademark infringement claims. Am. Compl. ¶¶ 92–101; *see, e.g., SH Grp. Glob. IP Holdings, LLC v. 2399 Collins Ave. Condo. Ass'n, Inc.*, No. 1:20-CV-22423-UU, 2020 WL 9893090, at *6 (S.D. Fla. Dec. 7, 2020) ("[I]n the Eleventh Circuit, the test for common law trademark infringement is the same as for federal trademark infringement under [the Lanham Act].") Likewise, "[u]nder Florida common law, unfair competition claims based on trademark infringement turn on the same 'likelihood of confusion' analysis as Lanham Act claims." *GOYARD ST-HONORE v. CHEAPGOYARDSTORE.COM*, No. 25-25088-CIV, 2026 WL 268264, at *3 (S.D. Fla. Jan. 15, 2026); *see Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) ("Courts may use an analysis of

federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition.") (citation modified); *see also Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652–53 (11th Cir. 2007) (holding that Florida unfair competition and trademark infringement use the same likelihood of confusion analysis as the federal Lanham Act test).

The Eleventh Circuit considers eight factors to assess a likelihood of consumer confusion: "(1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; . . . (7) the existence and extent of actual confusion in the consuming public;" and (8) "consumer sophistication." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 947 (11th Cir. 2023) (citation modified). A court "compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1361 (11th Cir. 2019) (citation modified).

Price presents evidence that he owns the federally registered trademark, "White Privilege Card," as used in connection with novelty plastic identification cards sold for entertainment purposes. Am. Compl. ¶ 8;

26

Trademark (Doc. 41-2) at 2. But Price fails to prove much more regarding his trademark infringement claims. Most notably, for purposes of his motion for a preliminary injunction, Price never submits evidence of the Mark in context.[8] *See* MCCARTHY § 23:52 (explaining that when comparing "word marks," courts consider "not only the similarity of the conflicting word marks, but also the similarity of lettering style, color and format as well as any background matter," and advising that "both parties' entire presentation of the word mark as seen by buyers should be considered"). Without evidence in the record of Price's Mark as consumers encounter it, the Court cannot assess its similarity with the screenshots of the allegedly infringing products displayed in Schedule B. For this reason alone, Price's motion for a preliminary injunction fails.

Even if the Court considered the image displayed during the February 4 hearing or the screenshot attached to the amended complaint, neither of which the sellers had proper notice of, Price's allegations are far too generalized and cursory to show a substantial likelihood of success on the merits. Price's strongest argument is against the sellers of products that share the same style as his. *See* Resp. to OSC at 2 (including descriptions of the two kinds of cards

---

[8] Despite being told at the February 4 hearing, Price did not submit an image of the Mark as an addendum to his motion for a preliminary injunction or as a separate paper upon which he relies for his motion. Although he included descriptions of his two kinds of cards in the amended complaint, Price did not adequately notify the defendants of his amended complaint, thereby violating Local Rule 6.02(b). *See* Am. Compl. at 42. And, regardless, uploading a filing to Dropbox is not sufficient notice under Rule 65.

that Price sells); Am. Compl. ¶ 38 (same), Ex. A at 9 (including an image of one card that Price sells). But Price's descriptions about the products are in papers outside the preliminary injunction record. Price otherwise offers only generalized arguments about the similarity of the goods. *See* Am. Compl. ¶¶ 59, 70 (asserting that the sellers' goods "are identical to, or substantially indistinguishable from, the Mark" without explaining how (or which) products are similar).

Of course, similarity is not the only factor in the confusion analysis. Although Price mentions that he developed his Mark and sells it on social media, his motion is otherwise silent as to the specific trade channels that he uses, his customer base, or how either are creating confusion with the individual sellers. *See* Price Aff. ¶ 5; Mot. TRO at 8. Price reports that his "marketing has led to unprecedented growth and awareness of [his] brand" and that he has millions of followers on social media. *See* Mot. PI at 7. But the question is not whether Price advertises, but the *similarity* in advertising. *See id.* (alleging that Price has expended resources advertising his product but offering no comparison or explanation of overlap). Price's conclusory allegation that he and the sellers operate in the same geographic areas is hardly enough to satisfy Rule 8. *See* Mot. TRO at 8. Also absent from the record is any evidence of actual confusion or argument about consumer sophistication—let alone

28

analysis of any specific infringing product. *See id.* Thus, even Price's strongest claims fail given his conclusory and vague allegations.

What is more, Price's allegations of similarity against at least four of the sellers' products fail on their face, as the cards are distinct from Price's Mark. *See* Sch. B at 9, 44, 45, 49. Several others use the words "White Privilege" or "White Privilege Card" but bear little resemblance to Price's products. *See, e.g.*, *id.* at 64, 131, 144, 149.[9] Though I raised this concern at the February 4 hearing, Price still includes them as allegedly infringing products in his amended complaint. *See* (Doc. 41-2). While many other products appear identical or nearly identical to the card displayed at the hearing (at least based on the screenshots, as no tangible products were introduced) and Price might ultimately succeed against some of those sellers, *see, e.g.*, *id.* at 2–8, 10–20, 22–38, Price offers no *specific* argument about any of them in his motion,[10] nor any evidence concerning the customer base, advertising, sellers' intent, actual

---

[9] Price reported that he voluntarily dismissed his claims against the seller whose online store appears to be depicted in the screenshot on page 64 of the original Schedule B. *See* (Doc. 51) at 2.

[10] As explained above, Price describes "two primary variations" of the products and says that he offers both for sale. Am. Compl. ¶ 38; Resp. OSC at 5–6. In the amended complaint, he does not specify which allegedly infringing products are in this style—instead, he cites generally to the exhibits showing more than 100 allegedly infringing products. *See* Am. Compl. ¶ 38. In his response to the order to show cause, he does include specific citations to the exhibits but nonetheless does not specify *which defendants* create those products. *See* Resp. OSC at 6.

consumer confusion, or consumer sophistication. While "[t]here are no hard and fast rules as to how much evidence of confusion is enough," surely this is not enough. *Custom Mfg. & Eng'g, Inc.*, 508 F.3d at 651 (quoting *Dieter v. B & H Indus. of Sw. Fla.*, 880 F.2d 322, 326 n. 3 (11th Cir.1989)).

Beyond the "likelihood of success" prong, Price fails to convince that his proposed remedies are appropriate or necessary to prevent irreparable harm. Price asks for a complete freeze on the defendants' finances. Specifically, he asks this Court to prohibit defendants from "transfer[ring] or dispos[ing] of any money or other of Defendants' assets in any of Defendants' financial accounts," and to require nonparty marketplaces and financial institutions to restrain and freeze funds. *See* Proposed PI at 7–9. As justification, Price proffers that such "preliminary relief" will facilitate permanent relief afforded under the Lanham Act, including an accounting of profits and disgorgement. *Id.* at 5. As Price rightly recognizes, the purpose of an asset freeze is to preserve the ability to later provide an equitable remedy. *See Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) ("A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief.").

30

But Price does not explain or provide evidence why preliminary relief of this scope—a total asset freeze of every defendant—is necessary to secure a later equitable remedy from any particular defendant. *See generally* Mot. PI.

What is more, the "recovery [of later equitable relief] almost never happens" in a Schedule A case. *See Zorro Prods.*, 2023 WL 8807254 at *4. "Instead, Schedule A plaintiffs rush into court, request and receive an asset freeze, and obtain a default judgment. And then, the Schedule A plaintiffs ask district courts to unfreeze the money and award statutory damages, not equitable relief." *Id.* In those sorts of scenarios, an asset freeze provides leverage, not equity. *See Eicher Motors*, 794 F. Supp. 3d at 553 (explaining the coercive nature of early asset freezes).

Further, unlike other Schedule A litigation, many of the defendants according to Price's amended complaint are based in the United States, mitigating one of the barriers that Pricer earlier alleged might prevent later recovery. *See* Am. Compl. ¶ 11. Given this and Price's failure to offer any specific justification for freezing the assets of any particular defendant, granting an asset freeze would go against the very purpose of equity.

Finally, I am unconvinced that the public and private interests weigh in favor of a preliminary injunction. For one, not all of the defendants have received notice of the motion for a preliminary injunction, *see* (Doc. 44) at 3, and, even for those that Price has noticed under Rule 65, Price has not proven

31

service of process of the underlying complaint for any seller. That creates one-sided briefing, which "renders balancing the private interests impossible." *Eicher Motors*, 794 F. Supp. 3d at 555. Moreover, the vagueness of the complaint cautions against an award of a preliminary injunction, particularly because an asset freeze is a powerful remedy. With such a dearth of information and lack of specificity, "there is significant doubt that the Schedule A mechanism serves the public interest" in its present form. *Id.*

### C. Joinder

Not only has Price failed to show entitlement to a preliminary injunction, but Price's action suffers from a structural problem—improper joinder.

Federal Rule of Civil Procedure 20(a) requires that allegations against parties arise out of the same transaction or occurrence. "[T]ransaction" is a "flexible" term, and "may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." *Alexander v. Fulton County*, 207 F.3d 1303, 1303 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (quoting *Moore v. New York Cotton Exch.*, 270 U.S. 593, 610 (1926)). Accordingly, courts ask whether "there is a logical relationship between the underlying operative facts and the claims brought." *Louis Vuitton Malletier v. Individuals, Bus. Entities, & Unincorporated Ass'ns Identified on Schedule "A,"*, No. 25-20867-CIV, 2025 WL 2256518, at *1 (S.D. Fla. Feb. 28, 2025). A

32

logical relationship exists between claims "when the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Id.* (quoting *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985) (per curiam)).

Price's initial complaint alleged only two commonalities—that the defendants violated the same trademark and some of the defendants' products appeared similar or identical. *See generally* Compl.; Sch. B. But "simply committing the same type of violation in the same way does not link defendants together for the purposes of joinder." *Omega, SA v. Individuals, Bus. Entities, & Unincorporated Ass'ns Identified on Schedule "A"*, 650 F. Supp. 3d 1349, 1353 (S.D. Fla. 2023) (citation modified).

In response to my order to show cause on why the sellers should not be severed, Order to Show Cause, Price argues for joinder on the basis that the "defendants' conduct forms a single series of supply-chain transactions." Resp. OSC (Doc. 39) at 3. He makes two arguments. First, Price alleges a hub-and-spoke theory of coordination. Price avers that, during the course of his investigation, "multiple downstream sellers . . . reported that they obtained infringing inventory from common upstream supplier storefronts . . . on large platforms, such as Amazon," but does not specify who or provide evidence. *Id.* The only proof he points to is the similarity in design, packaging, and

33

description of the products, and the fact that some defendants appear to sell goods in bulk. *See id.* at 5–6. Price does not divvy up the sellers on this account and the Court is left to guess which sellers Price proposes be grouped together.

Second, Price contends that, if I do sever, I should do so based on nonparty platforms. Specifically, he claims that "Defendants operating within the same platform ecosystem" such as Etsy or Amazon "often share listing titles, product imagery, and storefront data, further reinforcing the logical relationship among their actions." *Id.* at 7. Price cites to the compilation of screenshots but does not otherwise describe the listings, imagery, or data.

Price fails to persuade. To begin, Price speculates as to the sellers' relationships without supporting evidence. Although reasonable allegations of logical relationships might suffice at times, here, the allegedly infringing products are hardly sophisticated products, and the alleged similarity (based on the screenshots) proves little more than that it is seemingly easy to make and market the cards. That may very well be true, but it does not mean that joinder is proper under Rule 20. Price must show that the sellers' conduct is based on the same "operative facts" or "aggregate core of facts" to require that the defendants proceed together. *Louis Vuitton Malletier*, 2025 WL 2256518, at *1. "[A] plaintiff cannot satisfy Rule 20's requirements merely by alleging that multiple defendants have infringed the same intellectual property." *Tushbaby, Inc. v. Corps., Ltd. Liab. Cos., & Unincorporated Ass'ns Identified*

34

*on Schedule A*, 2024 WL 3741359, at *2 (S.D. Fla. Aug. 9, 2024) (collecting cases).

Moreover, Price's theories of joinder point in different directions. The first aims at joining a smaller seller with its larger supplier (although Price does not identify which downstream sellers should be joined with which upstream suppliers). *See* Resp. OSC at 5–6. Price's second theory suggests grouping the sellers by marketplace. Price does not explain why a "platform ecosystem" gives rise to the same "operative facts" or "aggregate core of facts." Of course, the record shows that Price includes products that bear little—if any—resemblance to the others or to the description of his Mark, and yet he never addresses those sellers' inclusion in the action. *See* Am. Compl.; *see, e.g.*, Sch. B at 9.

Federal Rule of Civil Procedure 21 likewise counsels in favor of severance by ensuring that the case is manageable moving forward. Under Federal Rule of Civil Procedure 21, a "court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." FED. R. CIV. P. 21. At least until Price establishes a sufficient ground for joinder, severance provides clarity for the Court to assess the merits of the claims against each defendant, to ensure that each defendant has proper notice, and to award preliminary equitable relief only if warranted. *See Corp v. Individuals, Partnerships*, No. 24-24969-CIV, 2025 WL 1433742, at *2 (S.D. Fla. Jan. 7,

2025) (explaining that courts have broad discretion to join or sever parties, including in the Schedule A context (citing *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1326 (S.D. Fla. 2014) (describing courts' discretion to sever misjoined parties as "virtually unfettered"))).

## IV. Conclusion

Following this Court's entry of a temporary restraining order, Price moves for a preliminary injunction. After careful review, I vacate the temporary restraining order, deny the motion for a preliminary injunction, and dismiss all but Defendant Liesl Cone from this action as improperly joined because Price does not offer sufficient evidence to show that the defendants are logically connected.[11]

Accordingly, the following is **ORDERED:**

1. The Temporary Restraining Order (Doc. 12) and the orders extending it (Docs. 18 and 20) are **VACATED**.

2. The Order to Show Cause (Doc. 23) is **DISCHARGED** and the Motion for Contempt Against Third Parties (Doc. 21) is **DENIED** as moot.

3. The Motion for Preliminary Injunction (Doc. 19) is **DENIED**.

4. The Clerk is directed to **UNSEAL** all filings.

---

[11] Cone is the only defendant to have filed an answer and alleged counterclaims. *See* Answer & Countercls. To avoid any procedural complications, the Court elects to keep Cone in this action and allow Price to bring claims against the other sellers in new actions.

5. The February 20, 2026 Hearing on the Motion for a Preliminary Injunction is **CANCELLED**.

6. As soon as possible but no later than noon on **February 20, 2026**, Price must provide notice of this Order to all current defendants, former defendants, and nonparties in this action, including every seller identified on Schedule A (Doc. 2-1) and every third party or nonparty that Price contacted in his efforts to enforce the now-vacated Temporary Restraining Order. No later than **February 23, 2026**, Price shall submit proof to this Court of such notice.

7. The Amended Complaint (Doc. 41) is **DISMISSED** without prejudice as to all remaining defendants except Liesl G. Cone. The Clerk is **DIRECTED** to **SUBSTITUTE** "Liesl G. Cone" as the only defendant in this action, and to keep Joel Price as Counter Defendant.

8. The Motion to Appear Electronically (Doc. 54) is **DENIED** as moot.

9. The Clerk is **DIRECTED** to mail this order to the addresses on file for the pro se sellers who have responded: James Anthony Denier, Xiaohan Zheng, and McMiffin Solutions, LLC.

   **ORDERED** in Tampa, Florida, on February 19, 2026.


Kathryn Kimball Mizelle
United States District Judge